J-S23011-18

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | | |
|---|---|---|
| COMMONWEALTH OF PENNSYLVANIA | : | IN THE SUPERIOR COURT OF |
| | : | PENNSYLVANIA |
| | : | |
| v. | : | |
| | : | |
| | : | |
| LEYRON JOHNS | : | |
| | : | |
| Appellant | : | No. 2364 EDA 2017 |

Appeal from the Judgment of Sentence February 3, 2017
In the Court of Common Pleas of Delaware County Criminal Division at
No(s): CP-23-CR-0007246-2015

BEFORE: SHOGAN, J., NICHOLS, J., and STEVENS*, P.J.E.

MEMORANDUM BY SHOGAN, J.: **FILED MAY 18, 2018**

Leyron Johns ("Appellant") appeals from the judgment of sentence entered in the Court of Common Pleas of Delaware County on February 3, 2017, following a bench trial. We affirm.

Joseph Torres ("Torres") was fatally shot on July 15, 2015, in the City of Chester, Delaware County, Pennsylvania. Appellant was arrested and charged with the death of Torres on October 10, 2015. During a police interview on that day, Appellant confessed to killing Torres. Appellant sought suppression of his confession by filing an omnibus pretrial motion on March 28, 2016. Following a hearing, the trial court denied the motion. Order, 6/8/16.

Appellant proceeded to a four-day nonjury trial in October of 2016. The trial court found Appellant guilty of first degree murder, robbery, and

_____

* Former Justice specially assigned to the Superior Court.

possession of an instrument of crime ("PIC").[1] Verdict Slip, 10/14/16. On February 3, 2017, the trial court sentenced Appellant to: incarceration for life without the possibility of parole on the murder conviction; a consecutive sentence of incarceration for seventy-two months to 144 months on the robbery conviction; and a concurrent sentence of six months to twelve months on the PIC conviction. Appellant filed post-sentence motions on February 13, 2017, which the trial court denied. Order, 6/9/17. This timely appeal followed. Appellant and the trial court complied with Pa.R.A.P. 1925.

On appeal, Appellant presents the following questions for review:

1. Whether the Appellant's confession was obtained in violation of his right to due process of law and against self incrimination, guaranteed the Appellant by the Fourth, Fifth, Sixth and Fourteenth Amendments to the United States Constitution and Article 1 Sections 8 and 9 of the Pennsylvania Constitution, where, under the totality of the circumstances, the confession was involuntary in that it was not the product of Appellant's free will and unconstrained choice, but, instead, was the result of manipulative, coercive and overreaching interrogation by police.

2. Whether the trial court committed legal error and abuse of its discretion in admitting into evidence testimony of a deputy district attorney regarding the agreement between the Commonwealth and a cooperating co-defendant, who testified in exchange for reduced charges.

Appellant's Brief at 4.[2]

---

[1] 18 Pa.C.S. §§ 2502, 3701, and 907, respectively.

[2] In his Pa.R.A.P. 1925(b) statement, Appellant raised two suppression issues, one concerning his confession and one concerning a DNA sample. Pa.R.A.P. 1925(b) Statement, 7/31/17, at ¶¶ 1, 2. However, Appellant has

Appellant first argues that the trial court abused its discretion by denying the motion to suppress because Appellant's confession was not "the product of Appellant's free will but, instead, [was] obtained as a result of coercion and overreaching by police." Appellant's Brief at 19. Appellant "contends that the totality of the circumstances demonstrates that his confession was not given voluntarily." *Id.* at 23. Appellant highlights his confinement in the holding area and the police detective's failure to provide a written *Miranda*[3] form before the interview, misuse of a recording device, falsification of evidence, coercion, and psychological manipulation. *Id.* at 23–27.

> Our standard of review in addressing a challenge to a trial court's denial of a suppression motion is limited to determining whether the factual findings are supported by the record and whether the legal conclusions drawn from those facts are correct.
>
> We may consider only the evidence of the prosecution and so much of the evidence for the defense as remains uncontradicted when read in the context of the record as a whole. Where the record supports the findings of the suppression court, we are bound by those facts and may reverse only if the court erred in reaching its legal conclusions based upon the facts.
>
> Moreover, it is within the lower court's province to pass on the credibility of witnesses and determine the weight to be given to their testimony.

---

not presented the DNA issue in his appellate brief; therefore, we consider that issue abandoned and will not address it. Pa.R.A.P. 2116(a).

[3] *Miranda v. Arizona*, 384 U.S. 436 (1966).

Furthermore, our Supreme Court . . . clarified that the scope of review of orders granting or denying motions to suppress is limited to the evidence presented at the suppression hearing.

***Commonwealth v. Williams***, 176 A.3d 298, 315–316 (Pa. Super. 2017)

(internal formatting, quotation marks, and citations omitted).

Regarding the voluntariness of a confession, we have stated:

"It is well-established that when a defendant alleges that his confession was involuntary, the inquiry becomes not whether the defendant would have confessed without interrogation, but whether the interrogation was so manipulative or coercive that it deprived the defendant of his ability to make a free and unconstrained decision to confess." ***Commonwealth v. Yandamuri***, ––– Pa. ––––, 159 A.3d 503, 525 (2017) (internal citations omitted). Voluntariness is the touchstone inquiry when deciding a motion to suppress a confession, and voluntariness is determined upon review of the totality of the circumstances. ***Commonwealth v. Nester***, 551 Pa. 157, 709 A.2d 879, 882 (1998). In assessing the totality of the circumstances, the suppression court should consider: "the duration and means of the interrogation; the defendant's physical and psychological state; the conditions attendant to the detention; the attitude exhibited by the police during the interrogation; and all other factors that could drain a person's ability to resist suggestion and coercion." ***Yandamuri***, 159 A.3d at 525.

***Commonwealth v. Fitzpatrick***, ___ A.3d ___, 2018 PA Super 55, at *5 (Pa.

Super. filed March 14, 2018). Additional relevant factors include:

the accused's age and level of education and experience; his extent of previous experience with the police; whether the accused was advised of his constitutional rights; whether he was injured, ill, drugged, or intoxicated when he confessed; whether he was deprived of food, sleep or medical attention, and whether he was abused or threatened with abuse.

***Yandamuri***, 159 A.3d at 525 (citation omitted). Furthermore, the

Pennsylvania Supreme Court has found that the use of artifice or intentional

misrepresentations to obtain a confession is insufficient to make an otherwise voluntary confession inadmissible "where the deception does not produce an untrustworthy confession or offend basic notions of fairness." ***Commonwealth v. Williams***, 640 A.2d 1251, 1259 (Pa. 1994).

In an effort to facilitate effective appellate review of Appellant's suppression issue, the trial court provided the following findings of fact and conclusions of law:

### **Findings of Fact**

1. Detective Adam Sendek, currently of the Delaware County Criminal Investigation Division (hereinafter "CID"), has been with CID for 16 years. Prior to his position within the Homicide Squad of CID, Detective Sendek was a police officer with the Chester Police Department for 30 years and 3 months. N.T., 5/6/16, p. 15. Detective Sendek has advised suspects of their Miranda warnings many times[5] over the course of his career. Id. at 15.

    > [5] Detective Sendek approximated that he has administered Miranda warnings "a thousand plus" times. N.T., 5/6/17, p. 15.

2. Detective Sendek was assigned to investigate the shooting of Joseph Torres on July 27, 2015 in the City of Chester along with Patrick Mullen from the City of Chester Police Department. *Id.* at 15-16.

3. On October 10, 2015, after he learned that the Appellant had been arrested, Detective Sendek went to the Chester Police Station. *Id.* at 16. He arrived at approximately 8:30 P.M. *Id.*

4. When he arrived, the Appellant was in the holding cell area of the police station, which is located on the ground floor of the police station. *Id.* at 17. The Appellant was sitting on a bench. *Id.* at 17.

5. Detective Sendek approached the Appellant and took him from the cell block to an interview room on the third floor of the police station. *Id.* at 17. The Appellant was handcuffed. *Id.* [at 18.]

6. Corporal Carey of the Chester Police Department accompanied Detective Sendek and was present during the interview of the Appellant.

7. When they reached the room, Detective Sendek removed the handcuffs from the Appellant's hands and explained that he was under arrest for the murder of Joseph Torres. *Id.* at 18.

8. Detective Sendek then read the complaint and affidavit of probable cause to the Appellant. *Id.* at 18.

9. Detective Sendek turned on a digital recorder and read the Miranda warnings to the Appellant from a printed card. *Id.* at 19-20. *See also* Commonwealth Exhibit CS-1. Specifically, Detective Sendek advised the Appellant that he had the right to remain silent, that anything he told him could be used against him in court, that he had the right to have an attorney present during questioning, and that if he could not afford an attorney that one would be provided for him free of charge. *Id.* at 24.

10. After he had given the warnings, Detective Sendek told the Appellant about the evidence that the police had obtained during their investigation and advised the Appellant that the police had obtained a video surveillance from the crime scene and found his fingerprints in the victim's pickup truck. *Id.* at 21-22.

11. The Appellant told Detective Sendek that his fingerprints were likely in the victim's car because he had been in the truck the week prior, when he had helped him purchase pills in Chester. *Id.* at 22.

12. Detective Sendek also advised the Appellant that his co-defendant, Ronald Myers, had made a statement to police implicating the Appellant in the crime. *Id.*

13. The Appellant told Detective Sendek that he was at home at the time of the shooting and that he had an alibi. *Id.* at 22.

14. It was at this point of the interview, after speaking to the Appellant for about 10 minutes, that Detective Sendek realized that the audio recorder was not turned on. *Id.* at 22-23, 62. He noticed the "red" record[ing] light on the tape recorder was not illuminated. He then turned the recorder "on" and continued the interview. He reiterated some of the conversation that he had just had with the Appellant. He did not re-read the Miranda warnings at this time. He explained to the court that he restated the following: "I thought we were recording earlier, but apparently we had a mistake. You were given your Miranda warnings, correct? Yes. And after giving you your warnings to have an attorney present before and after questioning, you decided to talk to us? Yes. And I read the complaint to you - against you charging you with murder? Yes." *Id.* at 27.

15. Detective Sendek then began speaking to the Appellant again. This recorded interview lasted approximately 25 minutes. *Id.* at 30, 63. During this interview, the Appellant confessed to his involvement in the homicide.

16. The Appellant did not ask to have an attorney present and did not attempt to terminate the interview. *Id.* at 35.

17. After the interview, Detective Sendek went over his Miranda rights again, using a form this time that was provided to him by Corporal Carey. *Id.* at 30, 32, 35-36; see also Commonwealth Exhibit CS-3. Detective Sendek explained that the Appellant initialed the seven questions contained on the form and signed it in three places. *Id.* at 32. The Appellant then asked Detective Sendek to turn on the recorder again and he made a second statement. This interview lasted approximately 2 minutes. *Id.* at 63.

18. At the conclusion of the interview, Detective Sendek thanked the Appellant and walked him down to the cell block. *Id.* at 34.

## **Conclusions of Law**

1. When deciding a motion to suppress a confession, the touchstone inquiry is whether the confession was voluntary. *Commonwealth v. Nester*, 551 Pa. 157, 164, 709 A.2d 879, 882 (1998) (citing *Arizona v. Fulminante*, 499 U.S. 279, 111

S.Ct. 1246, 113 L.Ed.2d 302 (1991); *Culombe v. Connecticut*, 367 U.S. 568, 81 S.Ct. 1860, 6 L.Ed.2d 1037 (1961)). Voluntariness is determined from the totality of the circumstances surrounding the confession. *Id.* (citing *Fulminante*; *Schneckloth v. Bustamonte*, 412 U.S. 218, 93 S.Ct. 2041, 36 L.Ed.2d 854 (1973); *Commonwealth v. Jones*, 546 Pa. 161, 683 A.2d 1181 (1996)).

2. To be admissible, a confession must be voluntary. *Commonwealth v. DiStefano*, 782 A.2d 574, 581 (Pa. Super. 2001).

3. In determining voluntariness, the court should look at "the duration and means of the interrogation; the physical and psychological state of the accused; the conditions attendant to the detention; the attitude of the interrogator; and any and all other factors that could drain a person's ability to withstand suggestion and coercion." *Nester*, 551 Pa. at 164.

4. It is the Commonwealth's burden to prove by a preponderance of the evidence that the defendant's confession was voluntarily made. *Id.*

5. The suppression court, which hears and evaluates the testimony, must determine whether the Commonwealth has established by a preponderance of the evidence that the confession was voluntary. *Commonwealth v. Kichline*, 468 Pa. 265, 280, 361 A.2d 282, 290 (1976).

6. In the case *sub judice*, the Appellant was not subjected to a lengthy interrogation. He was given his *Miranda* warnings prior to the commencement of the interview with Detective Sendek and he made it clear that he understood and was waiving his rights.

7. The Appellant was not physically coerced and was not made any false promises by the police. The record reflects that his decision to give a statement was the product of his free will and unconstrained choice.

8. The Commonwealth proved by a preponderance of the evidence that the Appellant's confession was voluntary.

Trial Court Opinion, 11/8/17, at 6–9.

Our review of the suppression testimony confirms that the trial court's factual findings are supported by the record and its legal conclusions drawn from those facts are correct. **Williams**, 176 A.3d at 315–316. According to Detective Sendek, Appellant did not appear to have and did not complain of any physical problems while in police custody. N.T., 5/6/16, at 18, 35. During the interview process, Appellant was not handcuffed, although he was in leg irons. **Id.** The interview room was approximately twenty feet by eight feet; it had one window, a table and three or four chairs. **Id.** at 40–41. Only Detective Sendek and Corporal Carey were present in the room, and only Corporal Cary was in uniform. **Id.** at 17, 35, 38.

Detective Sendek began the interview by informing Appellant why he was being questioned, and he read to Appellant the criminal complaint and affidavit of probable cause. N.T., 5/6/16, at 18–19. Detective Sendek then stated to Appellant, "[I]n order for me to talk to you, I have to give you your rights, your [**Miranda**] warnings." **Id.** at 20, 42. Although Detective Sendek usually employs a **Miranda** waiver form, he chose to use a digital recorder and read the **Miranda** warnings to Appellant from the "little blue card that [he] would have in [his] wallet." **Id.** at 19–20, 23–25, 42-43, Exhibit CS-1 (blue card). Appellant agreed to speak with the detective. **Id.** at 24. Detective Sendek did not conduct any questioning before turning on the recorder. **Id.** at 20.

Within ten minutes of interviewing Appellant, Detective Sendek noticed that the recorder was not operating. N.T., 3/6/16, at 21–22, 62–63. He apologized to Appellant and went "[b]ack on the record[.]" *Id.* at 23. Although Detective Sendek did not restate the *Miranda* warnings in their entirety once the recorder was operating, Appellant confirmed on the record that they had been given to him, that he agreed to talk with the detective, and that he knew the interview was being recorded. *Id.* at 26–27, Exhibits CS-2 (tape of digital recording) and CS-2A (transcript of recorded interview). The recorded interview lasted approximately twenty-five minutes. *Id.* at 30. At the conclusion of the recorded interview, Appellant initialed and signed a written *Miranda* warning waiver form that Corporal Carey provided. *Id.* at 30, 32–35, 50–51, 62, Exhibit CS-3. Appellant then asked Detective Sendek to go back on the record, and the detective complied. *Id.* at 30–32, 60, Exhibits CS-2 and CS-2B (transcript of second recorded interview). The second recorded interview lasted approximately two minutes. *Id.* at 34.

Detective Sendek conceded that he confronted Appellant about the falsity of his statements and told Appellant that the police had a witness and video evidence which, in fact, they did not have. He also played on Appellant's relationship with his mother, suggesting that she would suffer emotional and financial harm as a result of his bad decision. *Id.* at 54–59.

Viewing the totality of the circumstances, we discern no basis for Appellant's claim that the police interrogation was so manipulative or coercive

that it deprived Appellant of his ability to make a free and unconstrained decision to confess. *Fitzpatrick*, ___ A.3d at ___, 2018 PA Super 55, at *5. "[T]he trial court had the opportunity to observe Appellant's demeanor extensively during the suppression hearing to assess whether his personality is one likely to be overborne." *Yandamuri*, 159 A.3d at 526. The entire interview process lasted fewer than thirty minutes. At no time during the interviewing did Appellant refuse to speak with Detective Sendek or Corporal Carey. He did not ask for an attorney or attempt to end the recorded interviews. During the interviewing, Appellant was not harmed, injured, drugged, or intoxicated; he was not denied food, water, or sleep. Appellant indicated that he understood his *Miranda* rights when read to him by Detective Sendek; he voluntarily signed the *Miranda* waiver form; and he initiated the second recorded interview. Nothing in Appellant's confession suggests that he was under compulsion to confess or that he was physically or mentally compromised. Finally, Detective Sendek's tactics did not amount to manipulative or coercive conduct that deprived Appellant of his ability to decide to confess voluntarily. *See Nester*, 709 A.2d at 884 ("Not all psychological persuasion is prohibited. Encouraging a suspect to cooperate with the investigation and answer questions honestly is a permissible interrogation tactic."). Accordingly, we conclude Appellant has failed to establish that his confession was involuntary and should have been suppressed.

Next, Appellant contends that the trial court erred by admitting the testimony of Deputy District Attorney Stephanie Wills ("Wills") regarding an agreement between the Commonwealth and a cooperating co-defendant, Ronald Myers ("Myers"), who testified in exchange for reduced charges. Appellant's Brief at 27. Appellant argues that "evidence of the agreement was utilized to improperly bolster the credibility of Ronald Myers." *Id.* According to Appellant, because "[a]n express requirement of the Agreement is that Myers testify truthfully" and Wills testified that Appellant "had done nothing to cause the Commonwealth to void the agreement," "the prosecutor personally assured the trial court of the veracity of the witness." *Id.* at 27, 28, 29.

Evidence is relevant if: (a) it has any tendency to make a fact more or less probable than it would be without the evidence; and (b) the fact is of consequence in determining the action. Pa.R.E. 401. The trial court may exclude relevant evidence if its probative value is outweighed by a danger of one or more of the following: unfair prejudice, confusing the issues, misleading the jury, undue delay, wasting time, or needlessly presenting cumulative evidence. Pa.R.E. 403. Evidence will not be prohibited merely because it is harmful to the defendant. *Commonwealth v. Kouma*, 53 A .3d 760, 770 (Pa. Super. 2012). Exclusion is limited to evidence so prejudicial that it would inflame the jury to make a decision based upon something other than the legal propositions relevant to the case. *Id.* The trial court is not

required to sanitize the trial to eliminate all unpleasant facts from the jury's consideration where those facts are relevant to the issues at hand and form part of the history and natural development of the events and offenses for which the defendant is charged. **Commonwealth v. Page**, 965 A.2d 1212, 1220 (Pa. Super. 2008).

Furthermore, the Pennsylvania Supreme Court has stated, "Improper bolstering or vouching for a government witness occurs where the prosecutor assures the jury that the witness is credible, and such assurance is based on either the prosecutor's personal knowledge or other information not contained in the record." **Commonwealth v. Smith**, 995 A.2d 1143, 1157 (Pa. 2010). However, reference to a plea agreement that requires truthfulness does not constitute improper vouching. **Commonwealth v. Miller**, 819 A.2d 504, 515 (Pa. 2002).

The trial court disposed of this issue as follows:

> In his final issue on appeal, [Appellant] asserts that the court erred in permitting Deputy District Attorney Stephanie [Wills] to bolster Myers' credibility during trial. The court respectfully submits that Appellant is not entitled to any relief on this claim.
>
> It is well established that the trial court's decision to admit evidence is subject to review for an abuse of discretion. *Commonwealth v. Dengler*, 586 Pa. 54, 890 A.2d 372, 379 (2005). "An abuse of discretion may not be found merely because an appellate court might have reached a different conclusion, but requires a result of manifest unreasonableness, or partiality, prejudice, bias, or ill-will, or such lack of support so as to be clearly erroneous." *Commonwealth v. Dillon*, 592 Pa. 351, 925 A.2d 131, 136 (2007); *Grady v. Frito-Lay, Inc.*, 576 Pa. 546, 839 A.2d 1038, 1046 (2003).

- 13 -

At trial, Attorney Wills testified regarding the plea agreement that was reached between her office and the Appellant's co-conspirator Ronald Myers. She explained that she met with Myers and his attorney and they signed an agreement on November 9, 2015. N.T., 10/5/16, pp. 190-[1]92. Pursuant to the plea agreement, Myers agreed to plead guilty to third degree murder, robbery, and criminal conspiracy to deliver a controlled substance. *Id.* at 191. In return, the charge of first degree murder was withdrawn and the Commonwealth agreed "that it will not make [sic] a position at sentencing . . . that [Myers] would enter the plea, and at the time of sentencing, the representative for the Commonwealth would only hand up the guidelines." *Id.* at 192. She explained that Myers sentencing was deferred until after the conclusion of the Appellant's trial and that her office would inform the sentencing judge that Myers had testified for the Commonwealth. *Id.* at 193.

The court submits that this testimony was relevant to show any motivation that Myers may have had for testifying at trial and implicating the Appellant in the homicide of Torres. Attorney Wills explained to the court that while the Appellant was promised that the Commonwealth would inform the sentencing court that he cooperated at trial by testifying as a Commonwealth witness, he was not necessarily promised any leniency or given any other assurances by their office. This court submits that it did not abuse its discretion in admitting this evidence.

Trial Court Opinion, 11/8/17, at 11–12.

Upon review of the certified record, we discern no abuse of the trial court's discretion in admitting Wills' testimony. We recall that this was a nonjury trial; therefore, the trial court sat as the fact finder. **See Commonwealth v. Myers**, 722 A.2d 649, 651–652 (Pa. 1998) (citing **Commonwealth of Pennsylvania**, **DoTv. O'Connell**, 555 A.2d 873 (Pa. 1989) ("As long as sufficient evidence exists in the record which is adequate to support the finding found by the trial court, as factfinder, we are precluded from overturning that finding and must affirm, thereby paying the proper

- 14 -

deference due to the factfinder who heard the witnesses testify and was in the sole position to observe the demeanor of the witnesses and assess their credibility.")).

Here, Myers informed the trial court that, pursuant to the open plea agreement, he was required to testify on behalf of the Commonwealth. N.T., 10/4/16, at 161; Exhibit C-65 (Myers' plea agreement).[4] He then implicated Appellant in the murder of Torres. *Id.* at 164–205. In turn, Wills did not offer her personal opinion about Myers' veracity; she indicated only that Myers was required to cooperate. N.T., 10/5/16, at 185–188. In fact, the following excerpt reveals that Wills avoided any suggestion that Myers testified truthfully:

> [PROSECUTOR]: And does that agreement generally set out what is expected of Mr. Myers in relation to his cooperation in this prosecution against his Co-Defendant?
>
> A    Yes.
>
> Q    And has Ronald Myers done anything to cause the Commonwealth to void its agreement with Mr. Myers?
>
> * * *
>
> [DEFENSE COUNSEL]: Objection.
>
> THE COURT:    I'll allow it. Your objection's overruled subject to what we talked about sidebar. The [c]ourt knows your concern.

---

[4]  We note that Commonwealth Exhibit C-65, Myers' plea agreement, is not included in the certified record. Therefore, we restrict our analysis of this issue to a consideration of Wills' testimony.

[WITNESS]: The agreement specifically lays out that it's up to—it's the Commonwealth's prerogative to make a determination if there's been any deviation from the agreement that Mr. Myers entered into, and there's been nothing that he has done differently than what's been expected of him outlined in this agreement.

N.T., 10/5/16, at 193. Even on cross-examination, Wills offered no assessment of Myers' credibility; she explained that he was to cooperate, which he did:

[DEFENSE COUNSEL]: Right. But if he doesn't testify against [Appellant], second-degree murder's not getting withdrawn, is it?

A    The agreement lays out his continued cooperation in this case, and obviously that was part of -- as he's been called as a witness in this case, so he did testify in this case.

Q    So the answer is yes, part of the agreement, part of his obligation in order to get second-degree murder withdrawn was that he testify against [Appellant]. Is that right?

A    The agreement lays out that he continues to cooperate in exchange for those three charges and the second-degree murder being withdrawn. It doesn't outline in there that he will be called as a witness. It outlines that he'll be continued [sic] cooperating, and –-

Q    If he refuses to testify, the deal's off, isn't it?

A    That would be not cooperating.

*Id.* at 194–195.

We conclude that Wills did not bolster Myers' testimony by assuring the fact finder that Myers was credible based on her personal knowledge or evidence not contained in the record. **Smith**, 995 A.2d at 1157. Rather, she informed the trial court that Myers was required to cooperate and that he did. Nor did Wills' testimony invade the fact finder's credibility determining

- 16 -

function. The trial court still had to determine whether the evidence presented at trial was reliable, including Myers' testimony implicating Appellant and Wills' testimony about the plea agreement. Appellant's contrary claim does not warrant relief.

Judgment of sentence affirmed.

Judgment Entered.

_Joseph D. Seletyn_

Joseph D. Seletyn, Esq.
Prothonotary

Date: 5/18/18